**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| ROXANE JEANNINE LUSTER,            )<br>                                                            )<br>            **Plaintiff,**                         )<br>                                                            )<br>v.                                                        )<br>                                                            )<br>CAROLYN W. COLVIN, Acting Commissioner  )<br>of the Social Security Administration,[1]     )<br>                                                            )<br>            **Defendant.**                     ) | Case No. 12-CV-15-PJC |

## OPINION AND ORDER

Claimant, Roxane Jeannine Luster ("Luster"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Luster appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Luster was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

At the hearing before the ALJ on February 18, 2009, Luster was 45 years old. (R. 32). She had a high school education and had completed vocational classes in computer repair and

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as Defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Cisco networking. (R. 34-35). She previously worked as a laundry attendant in a nursing home. (R. 36-37, 40-41). Luster testified that she could no longer work due to problems with her low back and right knee, as well as asthma-related breathing difficulties. (R. 35-36, 40).

Luster testified that her back pain began in approximately 1998. (R. 41). She stated that she experienced pain in her low back and right knee, and that the main reason she was unable to work was due to her back pain. (R. 35, 40). She stated that her back pain was constant, rating the pain level as five on a scale from one to ten. (R. 49). She described the pain as a constant ache in her low back. *Id.* At another point in her testimony, Luster compared her back pain to sharp labor pains. (R. 54). She also described the pain as a kind of pressure, as if someone were sitting on her. *Id.* Luster testified that her back pain was exacerbated by changes in the weather, and if she attempted to complete several household tasks, such as vacuuming, laundry, or sweeping. (R. 50, 81). Her back pain was aggravated by walking more than ten minutes at a time, which would lead to tingling, spasms, and pain. (R. 55). Her back pain was also aggravated by squatting, kneeling, standing, or sitting for extended periods of time. (R. 56-58). She noted that she had trouble sleeping on her back or stomach due to back pain. (R. 59-60). She stated that the most comfortable position to relieve her back pain was to sit on a couch with her feet up. (R. 40-41).

Luster noted that her knee pain originated in the muscle or bone behind the knee, and that the pain was similar to a needle being stuck in her knee, accompanied by a tingling feeling. (R. 39, 55). She noted that every three months, she experienced pain in her right knee, which would last a couple of days. (R. 40). She also experienced some tingling in her right foot if she wore tight shoes. (R. 55-56). She noted that her knee pain was also exacerbated by weather changes.

(R. 39). She stated that walking or standing for extended periods of time or bending her legs caused knee pain. (R. 39, 41). With regards to her asthma, she testified that pollen and certain household cleaning chemicals would aggravate her symptoms. (R. 38).

Luster testified that she could lift up to twenty pounds without increasing her back pain, but testified that reaching and stretching caused muscle spasms in her back. (R. 51-52). She noted that she could stand or sit for approximately ten minutes at a time before needing to change positions. (R. 56, 80). She testified that she slept only four to six hours per night due to back pain. (R. 59-60). Her back pain prevented her from washing dishes for more than ten minutes at a time. (R. 61-62). She was able to get up in the morning to prepare her children for school, and then spent the rest of the day doing household chores in short intervals, and sitting on the couch with her feet up. (R. 60, 79-80). She noted that she had trouble concentrating during the hearing, as well as when she was at home watching television or talking with her husband. (R. 63-64).

Luster described seeking treatment for her back pain and receiving pain medication, including Lortab, Flexeril, and Ultram. (R. 43). She had also taken Celebrex for pain, but discontinued it after a reaction caused tingling and numbness on the left side of her face. (R. 44). She had not sought treatment for her knee pain. (R. 38). She took Albuterol for her asthma, and Claritin for her allergies. (R. 36, 37). Luster testified that she began taking Prozac to treat stress after her identity was stolen in 2006. (R. 62). During the hearing, the ALJ questioned Luster about her possible dependence on Lortab or other narcotic pain medications. (R. 44-48). The ALJ noted the amount of time that Luster had been taking the drug and stated that he believed she had a narcotic dependence problem. *Id.* Luster denied an addiction to Lortab, and denied changing

3

doctors in order to receive a Lortab prescription. *Id.*

On February 15, 2003, an MRI of Luster's lumbar spine showed degenerative disc disease at L5/S1 and facette arthrosis.[2] (R. 226). Luster saw Erin J. Trippy, A.R.N.P., at Drumright Medical Clinic ("Drumright") twice in March of 2005. (R. 236, 237). At the first appointment, Luster complained of back pain related to her menstrual cycle. (R. 237). At the second appointment, Trippy noted some tenderness on palpation in the pelvic area, no real spasm in the lumbar sacral area, and a negative straight leg raise. (R. 236). She assessed Luster with dysmenorrhea exacerbating lumbar disc disease and increased Luster's Lortab prescription to three times a day. *Id.*

On May 9, 2005, Luster presented to Trippy again complaining of asthma and allergy symptoms. (R. 235). Trippy diagnosed Luster with asthma and prescribed Albuterol, as well as a one-time dose of Medrol, in case of an acute asthma episode. *Id.*

On September 30, 2005, Luster presented to Doug Brant, D.O., at Drumright, with complaints of a twisted ankle and sought a refill of her Lortab prescription. (R. 234). Dr. Brant noted that the Lortab was the only pain medication Luster was out of, even though two others had been prescribed at the same time. *Id.* He noted mild tenderness to palpation on the lumbar spine, and diagnosed chronic low back pain. *Id.* Dr. Brant recommended pain management for Luster, noting his unwillingness to prescribe Lortab long-term. *Id.* He noted that after a conversation with Trippy, that Trippy "fe[lt] that this medication regimen [Luster] is on is appropriate and I do not, so [Trippy] will have to follow the patient because I am not going to continue to prescribe

---

[2] Arthrosis is a "joint affection caused by trophic degeneration." *Taber's Cyclopedic Medical Dictionary* 156 (17th ed., 1989). Facet joints are "the zygapophyseal joints of the vertebral column between the articulating facts of each pair of vertebrae." *Id.* at 704.

4

narcotics for this patient." *Id.*

On October 31, 2005, Luster presented to Dr. Brant and complained of low back pain. (R. 233). Dr. Brant noted that Luster had been narcotic dependent for many years, and that he preferred to start a regimen of long-acting pain medications as well as pain management. *Id.* He noted decreased range of motion of the lumbar spine, and diagnosed Luster with chronic pain syndrome and chronic low back pain. *Id.* He discontinued the Lortab and Ultram prescriptions and replaced them with MS Contin for pain, with a plan to see her monthly and to prescribe Flexeril as needed. *Id.*

On November 20, 2005, Luster presented to Dr. Brant for her monthly follow-up appointment. (R. 232). Dr. Brant noted that Luster had been taking her medications appropriately. *Id.* He noted decreased range of motion of the thoracic and lumbar spine, and he refilled her prescriptions. *Id.*

On December 30, 2005, Luster had a follow-up appointment with Dr. Brant. (R. 231). She complained of excruciating back pain and noted that she had run out of Flexeril the day before. *Id.* She discussed how her work activities at the nursing home exacerbated her back pain. *Id.* Dr. Brant noted decreased range of motion of the thoracic and lumbar spine, as well as muscle spasms and tightness over the lumbar spine region, and bilaterally on the paravertebral muscle masses. *Id.* He diagnosed Luster with lumbar strain, acute chronic muscle pain and back pain. *Id.* He refilled her prescriptions including her prescription for Lortab for immediate usage only. *Id.*

On January 25, 2006, Luster had an appointment with Linda Hickman, M.D., at Drumright, where she complained of back spasms and sought a refill of her pain medications. (R. 230). Luster reported that she experienced constipation with the MS Contin and wished to return

to Lortab. *Id.* Dr. Hickman advised Luster to consider pain management, noting narcotic dependence in her assessment. *Id.* Luster was resistant to the idea of pain management and asked for one additional month of medications. *Id.* Dr. Hickman advised Luster that she would no longer prescribe narcotic pain medications for her, and gave her a sample of Ed-Flex for pain. *Id.* At this visit, both Drs. Hickman and Brant recommended pain management. *Id.* Luster expressed the possibility of seeking renewed prescriptions at Medical Associates of Cushing ("Cushing") instead. *Id.*

On February 1, 2006, Luster presented to Tracy Pyles, M.D., at Cushing, complaining of low back tingling and numbness. (R. 305). Dr. Pyles noted a muscle spasm in the paralumbar area, but that deep tendon reflexes were equal and symmetric and there was no weakness in major muscle groups. *Id.* Dr. Pyles prescribed Lortab, Flexeril, and Ultram. *Id.*

On April 4, 2006, Luster returned to Dr. Pyles, complaining of coughing and wheezing. (R. 303-04). Dr. Pyles diagnosed her with atopic asthma [3] and prescribed Albuterol. *Id.*

On July 3, 2006, Luster presented to Dr. Pyles, seeking a refill of her pain medications. (R. 301). Dr. Pyles noted that Luster had full and painless range of motion, and that she seemed better than the previous visit. *Id.* He refilled Luster's prescriptions for Lortab, Flexeril, and Ultram. *Id.*

On December 4, 2006, Luster had an appointment with Dr. Pyles and reported back pain, fever, diarrhea and vomiting. (R. 299). Dr. Pyles diagnosed her with gastroenteritis and prescribed a modified diet. *Id.* He also refilled her pain medication prescriptions. *Id.*

---

[3] Atopic asthma is asthma caused by allergies. *Dorland's Illustrated Medical Dictionary* 170 (31st ed., 2007).

On April 6, 2007, Luster returned to Dr. Pyles with complaints of nasal congestion. (R. 297). He prescribed Allegra for allergies, and refilled her prescriptions for Lortab, Flexeril, and Ultram. *Id.* He also ordered physical therapy to treat her low back pain. *Id.*

On April 9, 2007, Luster met with Eddie J. Traylor, P.T., at Green Country Physical Therapy ("Green Country") for an initial evaluation. (R. 241). Traylor noted Luster's long history of back pain, which began after childbirth, and pain in both knees. *Id.* He noted that she had gained twenty five pounds in the past few years, and that she had significant asthma which was controlled with an inhaler. *Id.* In his evaluation, Traylor noted that Luster was able to ambulate, but had a forward stooped posture and a slow walk. *Id.* She had tenderness to palpation in the low back region, especially on the right side, radiating into the buttock area. *Id.* He noted normal range of motion for upper extremities and cervical spine. (R. 241). Luster complained of pain in her lower extremities when she attempted hip flexion. *Id.* Traylor applied moist heat for twenty minutes and began a progressive lumbar rehabilitation and strengthening exercise program. *Id.* Traylor noted that Luster was able to tolerate the exercises and experienced some relief. *Id.* Traylor established a short-term goal of increasing overall range of motion and flexibility, decreasing back pain, and promoting weight loss. *Id..* He established a plan to see Luster twice a week for four weeks before the next assessment. (R. 241).

Luster attended twice weekly physical therapy appointments at Green Country from April 12, 2007 to August 7, 2007. (R. 246-281). Luster noted that she felt better after the first appointment, and that her back improved after several appointments. (R. 278, 280). She noted that her back was sore on April 30, 2007. (R. 277). She had no complaints of pain for the remainder of the first four-week period. (R. 275, 276).

On May 9, 2007, Traylor noted that Luster was making progress and that she noted feeling better. (R. 274). The goals for the next four-week period included decreasing complaints of low back pain and increasing overall range of motion and flexibility. *Id.* Luster had no complaints of pain until May 31, 2007, when she noted soreness in her hips. (R. 265, 266).

On June 11, 2007, Traylor noted that Luster continued to make progress and that she was able to do more around the home. (R. 263). The goals for the next four-week period included decreasing complaints of low back pain, increasing overall range of motion and flexibility, and increasing overall core stabilizer strength. *Id.* In this four-week session, Luster noted that the pain in her low back had decreased and that she felt she was getting stronger. (R. 259). On July 3, 2007, Luster noted slight soreness, but reported that she felt stronger. (R. 257).

On July 4, 2007, Traylor noted that Luster was making good progress and that her low back pain was better. (R. 256). The goals for the next four-week period included increasing overall strength and endurance, and increasing overall core stabilizer strength. *Id.* Luster had no complaints of pain for the four-week session and noted that she felt good. (R. 246-54).

On July 6, 2007, Luster was seen at Cushing, complaining of a burning and tingling sensation on the left side of her face after taking Lortab. (R. 295-96). It was noted that Luster had taken Lortab for five or six years. *Id.* It was also noted that Luster's physical therapy was helping greatly. *Id.* Luster's Lortab prescription was stopped and she was started on a new prescription of Celebrex. *Id.*

On August 31, 2007, Luster presented to Dr. Pyles, complaining of chest pain caused by the Celebrex. (R. 293). Dr. Pyles noted that Luster had an allergic reaction to hydrocodone and that the Lortab did not provoke chest pains. *Id.* He refilled her prescriptions for Lortab, Flexeril,

and Ultram. *Id.*

Luster did not return to Dr. Pyles until February 28, 2008, when she presented with complaints of stress after having her identity stolen and receiving death threats. (R. 312). Dr. Pyles diagnosed Luster with stress reaction and prescribed Prozac, as well as refilled her pain medication prescriptions. *Id.*

On August 6, 2008, Luster had an appointment with Dr. Pyles and reported generalized aches, pains, and fever. (R. 309). Dr. Pyles diagnosed Luster with a viral illness, and refilled her pain medication prescriptions. *Id.*

On February 12, 2009, Luster presented to Cushing and complained of aches, fever, and general malaise. (R. 357). It was noted that she had tenderness to palpation of the right lumbosacral junction, and Luster's pain medication prescriptions were renewed. *Id.*

On August 3, 2009, Luster had an appointment with Dr. Pyles and sought refills of her pain medications. (R. 355). Dr. Pyles noted Luster's continued back pain and refilled her prescriptions of Lortab, Flexeril, Ultram, Prozac, and Albuterol. *Id.*

On January 21, 2010, Luster presented to Dr. Pyles for a refill of her pain medications. (R. 353). Dr. Pyles noted Luster's continued back pain and he refilled her pain medication prescriptions. *Id.*

On July 9, 2010, Luster had a follow-up appointment with Dr. Pyles for her back pain and for refills on her pain medications. (R. 351). Dr. Pyles noted the presence of muscle spasms in Luster's back. *Id.* He also noted the continuation of Luster's back pain and stress reaction, and refilled her prescriptions. *Id.*

On January 3, 2011, Luster met with Dr. Pyles complaining of an asthma attack and

seeking refills of her pain medications. (R. 349). Dr. Pyles noted mild respiratory distress, and mild wheezing. *Id.* He diagnosed Luster with asthma and back pain, and refilled her prescriptions for Lortab, Flexeril, Ultram, Prozac, and Albuterol, with an additional prescription for Medrol to treat asthma. *Id.*

On August 10, 2007, Luther Woodcock, M.D., completed a Physical Residual Functional Capacity Assessment, and noted that Luster had degenerative disk disease. (R. 284). For exertional limitations, Dr. Woodcock opined that Luster could occasionally lift and/or carry fifty pounds; she could frequently lift and/or carry twenty five pounds; she could stand and/or walk with normal break periods for six out of eight hours in a work day; she could sit with normal break periods for six out of eight hours in a work day; and that she had unlimited capacity for pushing and/or pulling, except for the limits imposed on lifting and/or carrying. (R. 285). Dr. Woodcock noted that Luster could prepare meals, clean the house, do laundry, and go shopping. *Id.* He also noted that her MRI showed degenerative changes in the lumbar spine, but that no surgery had been performed. *Id.* He noted that Luster had the ability to frequently climb stairs, ramps, ladders, ropes, and scaffolding; could frequently balance, kneel, crouch, and crawl; and could occasionally stoop. (R. 286). He noted no manipulative, visual, communicative, or environmental limitations. (R. 287-88).

On November 30, 2007, Judy Marks-Snelling, D.O., M.P.H., reviewed the medical evidence in the file and determined that Dr. Woodcock's assessment of August 10, 2007 was affirmed as written. (R. 307).

On April 9, 2009, agency consultant Ashok Kache, M.D., M.B.A., conducted a motor nerve study, a sensory nerve study, an F-wave study, and an EMG (electromyogram) study. (R.

316-19). All test results were within normal limits. (R. 319).

On May 15, 2009, agency consultant John W. Hickman, Ph.D., conducted a mental status examination of Luster. (R. 320-29). Luster reported that she had a degenerated disk, which caused chronic pain, and limited her ability to sit, stand, walk, bend, and stoop. (R. 320). She noted that although the prescription pain medications helped, they did not eliminate her pain. *Id.* She stated that she needed to constantly change her position to manage her pain, and that her pain woke her up at night. *Id.* Luster also reported that she suffered from asthma. *Id.*

Dr. Hickman noted that Luster had no history of psychiatric treatment or counseling, and that, although she was held back in the fourth grade, she did not participate in any special education classes and she graduated from high school. (R. 321). He noted that she was previously married for ten years, and that she was six years into her second marriage. *Id.* She had four children, two of which lived at home. *Id.* She had worked in a nursing home for ten years – once for six years, and again for four years – quitting her job due to back pain. *Id.*

Dr. Hickman observed that Luster's thought content was relevant, coherent, and goal-driven, without loosening of associations. *Id.* Her affect was mildly depressed, but she denied difficulties with depression. (R. 321). She reported frustration with her physical limitations and the stress of having her identity stolen. *Id.* Luster stated that she suffered from occasional mood swings. *Id.* She noted that she was able to do some housework and cooking, as well as laundry, shopping, and cleaning, but that she had to do it slowly throughout the day. *Id.* She reported that she had trouble sleeping at night due to pain, and that she had problems with snoring and waking up tired. (R. 322). Dr. Hickman noted that Luster applied herself to the testing, and although she did not verbalize physical discomfort, she did shift her position frequently, stood up and walked

around, or stood behind a chair for support. (R. 321).

On the Wechsler Adult Intelligence Scales-III, Dr. Hickman reported that Luster had a verbal IQ of 77, a performance IQ of 84, and full scale IQ of 78. (R. 322). He noted that her sensory functions were all within normal limits. *Id.* He noted that Luster had a borderline auditory attention span, and a borderline ability to sustain concentration over time. (R. 323). She had a low average understanding of word meanings and a high school level recognition of words and spelling. *Id.* Her verbal abstract thinking skills and nonverbal concept formation skills were markedly impaired. (R. 324). She had a borderline difficulty being open about herself, and Dr. Hickman indicated that her profile was consistent with an individual who "ineffectively [tries] to ward off anxiety using somatic symptoms to avoid thinking or dealing with their psychological problems." *Id.*

Dr. Hickman diagnosed Luster on Axis I[4] with a pain disorder, associated with psychological factors, and a general medical condition. (R. 325). On Axis II, his impressions were borderline mental retardation, and features representing a histrionic personality disorder. *Id.* Dr. Hickman assessed Luster's Global Assessment of Functioning ("GAF")[5] as 60. *Id.* He opined that Luster could benefit from a "more aggressive treatment of her unrecognized depression," but that she did not meet "any SSI Mental Disability Criteria." *Id.*

---

[4] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[5] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A score of 51-60 reflects "moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning." *Id* at 34.

Dr. Hickman also completed a Medical Source Statement and opined that Luster had moderate limitations in her "ability to perform activities within a schedule, and maintain regular attendance and be punctual within customary tolerances." (R. 327). He also noted moderate limitation in Luster's "ability to maintain attention and concentration for extended periods," as well as in her "ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." *Id.* Dr. Hickman further noted moderate limitation in Luster's ability to "respond appropriately to change in the work setting," as well as in her "ability to travel in unfamiliar places or use public transportation." (R. 328).

On May 29, 2009, agency consultant Beau Jennings, D.O., examined Luster. (R. 330-47). Dr. Jennings noted that Luster gave "poor effort" during range of motion testing, and noted that Luster had a full range of motion in her lumbar and cervical spine. (R. 337-38, 340). Luster did not experience any pain during testing, had normal toe and heel walking, and had negative straight leg raises in the seated and supine positions. (R. 340). X-rays revealed "mild degenerative changes in the medial compartment" of Luster's right knee, but were "otherwise unremarkable." (R. 346). X-rays of Luster's lumbar spine showed sclerosis of the apophyseal joint, compatible with degenerative changes at L5-S1, but were otherwise unremarkable. (R. 347).

## Procedural History

Luster filed an application on June 19, 2007, for disability insurance benefits. (R. 91-94). Luster alleged the onset of her disability began March 29, 2006. (R. 167, 175). Luster's application for benefits was denied initially and on reconsideration. (R. 91-92). A hearing was

held before ALJ John W. Belcher on February 18, 2009. (R. 28-70). On November 10, 2009, a supplemental hearing was held before the ALJ. (R. 71-90). By decision dated May 17, 2010, the ALJ found that Luster was not disabled at any time through the date of the decision. (R. 14-24). On November 17, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[6] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing

---

[6] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education,

steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.* (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ determined that Luster met insured status requirements through September 30, 2011.  (R. 16).  At Step One, the ALJ found that Luster had not engaged in substantial gainful activity since the alleged onset date of March 29, 2006. *Id*.  At Step Two, the ALJ found that Luster had severe impairments of degenerative disc disease of the lumbar spine, asthma, obesity, pain disorder, and depressive disorder. *Id.*  At Step Three, the ALJ found that Luster's

---

work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

impairments, or combination of impairments, did not meet the requirements of a Listing. *Id.*

The ALJ determined that Luster had the RFC to perform light work, with the following additional limitations:

> [L]ifting and/or carrying 20 pounds occasionally and 10 pounds frequently; standing and/or walking for 6 hours out of an 8-hour day, 15 minutes at a time; sitting for 8 hours out of an 8-hour day, 15 minutes at one time; and pushing and/or pulling limitations 20 pounds occasionally and 10 pounds frequently; except occasionally balance, bend or stoop, climb ladders, ropes, and scaffolding, crouch, kneel, and crawl. She is able to work in a habituated work setting with no more than 2 hours between breaks; no high production, high quota, or rapid assembly line work; and limited need to travel between unfamiliar work sites or need to use public transportation to go between work sites.

(R. 18). At Step Four, the ALJ found that Luster could not perform any past relevant work. (R. 22). At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Luster could perform, considering her age, education, work experience, and RFC. (R. 22-23). Thus, the ALJ found that Luster was not disabled from March 29, 2006 through the date of the decision. (R. 23).

## Review

Luster argues that the ALJ's decision should be reversed, asserting three arguments. First, she argues that the ALJ failed to perform a proper Step Five determination. Second, she argues that the ALJ's credibility assessment was flawed. Third, she argues that the ALJ failed to properly consider medical source opinions. The Court finds that this case must be reversed and remanded because the ALJ's credibility assessment was not legally sufficient. Because reversal is required due to errors in the ALJ's credibility assessment, the other issues raised by Luster are not addressed.

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secy.*

*of Health & Human Servs.,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2001). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling ("SSR") 96-7p, 1996 WL 374186.

The Court is unable to find any discussion of Luster's credibility that approaches the required standard of providing specific reasons closely linked to substantial evidence. The only language addressing credibility is a boilerplate provision that Luster's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 19). The use of boilerplate language in Social Security disability cases was discussed and discouraged by the Tenth Circuit in *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). The court explained that boilerplate language was a conclusion in the guise of findings, whereas the task of the ALJ is to explain the specific facts of the case before him and how those facts led him to his decision. *Id.* Boilerplate statements fail to inform the reviewing court "in a meaningful, reviewable way of the specific evidence the ALJ considered." *Id. See also Bjornson v. Astrue,* 671 F.3d 640, 644-46 (7th Cir. 2012) (opinion authored by Judge Richard Posner criticizing the Social Security Administration's use of "templates" in ALJ disability decisions).

The undersigned is mindful that the simple inclusion of boilerplate, inapplicable, or improper language does not automatically indicate that the ALJ's credibility analysis is fatally flawed. Boilerplate provisions are not harmful in and of itself, but they are not a substitute for

actual analysis of the question of credibility by the ALJ. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1170 (10th Cir. 2012) ("boilerplate is problematic only when it appears 'in the absence of a more thorough analysis'") (*quoting Hardman*, 362 F.3d at 679).

After the initial boilerplate introduction, the ALJ set forth the factors of SSR 96-7p that are to be used in evaluating credibility. (R. 19-20). However, the ALJ never linked his discussion of the 96-7p factors to specific reasons why Luster was not credible. Affirmative linking of specific reasons with substantial evidence is one of the requirements of a credibility assessment. *See Keyes-Zachary,* 695 F.3d at 1172 (*citing Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005)). The ALJ simply recited the 96-7p factors and gave no explanation for why those factors supported a finding that Luster's claims of disabling pain were not credible. Instead, the ALJ summarized the medical evidence of record, and then discussed and weighed the opinion evidence. (R. 20-22). The ALJ then concluded that he:

> [did] not discount all of the claimant's complaints; however, the evidence demonstrates that even though the claimant does have medically determinable impairments, none are severe enough to prevent the claimant from participating in substantial gainful activity, given the residual functional capacity set forth above. Given the objective medical evidence in the record, I find that the claimant's residual functional capacity is reasonable, and that the claimant could function within those limitations without experiencing significant exacerbation of her symptoms.

(R. 22). This second credibility provision is also conclusory boilerplate and it does not illuminate any specific, reviewable reasons why the ALJ found Luster to be less than fully credible. *Hardman*, 362 F.3d at 678-81.

While there may have been sufficient reasons with supporting evidence that could justify an adverse credibility determination, the undersigned finds that the Court cannot make that determination without impermissibly substituting its judgment for that of the ALJ. *Peeper v.*

*Astrue*, 418 Fed. Appx. 760, 766 (10th Cir. 2011) (unpublished) (*citing Allen v. Barnhart*, 357 F.3d 1140, 1142, 1145 (10th Cir. 2004)).  On remand, the ALJ should provide a thorough analysis of Luster's subjective complaints, including a discussion of factors listed in 20 C.F.R. § 404.1529(c).  *Sistler v. Astrue*, 410 Fed. Appx. 112, 117 (10th Cir. 2011) (unpublished); *Hamby v. Astrue*, 260 Fed. Appx. 108, 113 (10th Cir. 2008) (unpublished).

Because the errors of the ALJ related to the credibility assessment require reversal, the undersigned does not address the remaining contentions of Luster.  On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Luster.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993).  This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case.  *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003) (*citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988)).

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 10th day of April, 2013.

_____
Paul J. Cleary
United States Magistrate Judge